Good morning, Your Honors. If it may please the Court, I'd like to proceed. I'm Sean Louise, and I'm the attorney for Plaintiff Patricia O'Connell in this matter. In this matter, the first point that I'd like to point out on the appeal is the unfortunate circumstance of the District Court to not enforce the Rule 16 scheduling order in this to file a motion for summary judgment, and the motion for summary judgment had already passed February 2005. So the difficulty, I mean, I guess I've got two difficulties with that, one of them being that sort of case management is very much a matter normally proposed within a District Court's discretion, but even apart from that, this is a legal issue, summary judgment, the exact same motion could have been made at any point as a motion for judgment as a matter of law. I don't understand the prejudice. Even if there – even if it weren't within the Court's discretion, what was the problem? Yes, I think I just left that in the point on appeal because if counsel just relies on the scheduling order to prepare matters, schedule witnesses, and it was just before trial, it should have been within the confines of a jury trial that that was raised, not allow a party who failed to take any initiative to bring that motion or leave to bring that motion months earlier. But as for the merits of the case, if it would please the Court, we could move into that matter, and in the merits of the case, the evidence shows that – that's in the record is that Ms. O'Connell asked for accommodations, and Exhibit 2 that's contained within excerpts of record, Tab 3, shows that the post office had certain light-duty activities that she could perform, answering phones and desk jobs, and she did ask for that in June of 2000, and that was in response to a letter. Unless I misunderstood it, the evidence showed that there were such jobs, but didn't show that any such job was available. And that's where the interactive process comes in, that Ms. O'Connell asked for the At that point, she actually was working – when you look at her declaration, in September of 2000, she was working actually five hours a day, and it was the supervisor for the United States Postal Service, Ms. Suki, that told her that she needed to change her status from postal supervisor, then the postal supervisor immediately said that there's no longer that five hours that she'd been working all that time. So to me, the plaintiff has been deprived of any accommodation at the invited request of Ms. Suki, the supervisor, who tells her, change your job title or your job status. You're no longer limited duty. I want you to change it to light duty, and then once she changes it, then she's no longer allowed to work those five days, and to me, that's like sleight of hand. You're saying, okay, I want your status changed. I want you to now be light duty, and now, even though you've been working five hours for all these months, even though it was a job-related injury, she's a postal carrier. She's delivering mail. She slips on the grass. She gets injured her back or hip, and she's asking for this accommodation. Now all of a sudden, the same thing that she'd been working all along as an accommodation is no longer an accommodation, and – She no longer had the physical ability to perform limited ability work, right? Well, she was. She was actually performing five hours a day in the office. Once the OWCP made its ruling, then she wasn't eligible for limited duty anymore, right? Well, the OWCP didn't make a ruling. It was that – because she had to change this status. She was given two choices. If I've got it right, the OWCP in July of 2000 found that she was – she no longer suffered her job-related injury. At that point, limited duty status wasn't any longer available. So didn't the supervisor then at that point give her the remaining options? If she felt she were unable to work full-time, she could either retire or go on light-duty status. Right? Well, the problem with that is at the time, even in the evidence that's submitted by the government, is that that decision with the Department of Labor was later overturned, and she was awarded $85,000 in pre-tax dollars, which goes into the whole argument that she was already made whole by the back pay under the Federal Workers' Compensation. So even though at one point the government was relying on – she's no longer – it's not a work-related injury. That was an incorrect finding that was later overturned in Ms. O'Connell's favor. Okay. But as it relates to your claim, your discrimination claim, at – you know, taking that moment as a snapshot moment before it was overturned, at that point she was given those options of either to retire disability or take light-duty, right? Yes. Okay. So then her work hours were reduced to one hour a day? Correct. And that's the – she's saying that because there were some males who were given more hours to work than she, that was discrimination? Yes. Okay. That's correct. And – Tell us why that's discrimination. Well, the Rehabilitation Act that relies on the Americans with Disabilities Act, the case law that came down from the Ninth Circuit in this very circuit, with the interactive process, there's an obligation of the employer to work with the employee to find suitable accommodations. And it's not just a one-time event. It's supposed to be that these employers work with employees to find a suitable accommodation that works. So where was that claim made? Now, that's a separate failure to engage in the interactive process. Where was that argument made? Was that made in your brief, that there was a failure to engage in the interactive process? Well, that – I believe the part in the brief was more directed to whether or not they accommodated her. Exactly. So tell us why there was a failure to accommodate when there were no additional jobs that were available. There was kind of a hierarchy of how they placed people into the jobs. And so because the males were on limited-duty status, as opposed to light-duty status, it was the procedure of the post office was to give them more hours. And they had a rational reason for that. How is there discrimination there? Well, the supervisor directed her to change her status. But for the supervisor directing her to change her status, she would have been in the same position as the three males were. Now, where in the record does it say that the director directed her to change her status? It's in her declaration. That's tab 3, page 17 on the lower right-hand corner, paragraph 4. So does she have the option to become – your argument is she had the option to take limited-duty as opposed to light-duty? Is that your argument? To remain limited-duty. To remain limited-duty. Because that's what she was doing up until Ms. Suki told her to change that title. Right. But if the Office of Workers' Compensation Program said that she was no longer disabled, how could she remain limited-duty? Well, it did say that she could be permanent light-duty, and the doctors gave – But how could she remain limited-duty if the Workers' Compensation Program has said you are no longer entitled? Well, that was later overturned as erroneous. I know, but at that point in time – we're looking at that point in time because you're discriminated against. So if the Workers' Compensation Program said you're no longer disabled, at that point, how could she be entitled to a limited-duty status? Well, that's still basically putting form over substance. Whether you call it limited-duty or light-duty, there was an accommodation that could have been worked out. Whether you call her job status limited or light, she was able to work in the office. It's a difference. So limited-duty people are people who have been determined officially on the work – my understanding is that people who are on limited duty are those who have been determined under the Workers' Compensation Program to be entitled to this status, and people who are on light-duty are in a different category. So once she was determined not to be – you know, have a work-related injury, she was no longer entitled to limited-duty. If you have a non-work-related issue, then you can have light-duty. Maybe under the Federal Workers' Compensation Statute, but this is not. She didn't bring the claim in federal court under the Workers' Compensation Statute. She brought it under a Federal Rehabilitation Act of 1973, which is the Title I, the federal the receipt of federal aid. I understand, but you have to show some discrimination. I don't get how you get a discrimination claim if there's a rational, non-gender-related reason for the placement. But that would be the same if there was a rational basis based on a collective bargaining agreement. The ADA is a federal statute. The Rehab Act would still override – can still override a collective bargaining agreement that looks like it's rationally related because she has protections afforded to her by the Rehab Act. Discrimination. I don't understand the discrimination. Not allowing her to still do the same job that she was doing every day for five hours a day, irrespective of what you call it. But the Workers' Compensation Board said you're no longer – your injury is no longer job-related, so you don't get that status anymore. How is that discrimination if she's not entitled to that status? Well, again, the problem is later that was an incorrect – why should the defendant benefit from the wrongdoing? They made an incorrect determination that she was no longer – But when it was overturned, she was compensated for that. I mean, there was – they didn't benefit from it because they had to pay her the back wages. But then the federal statutes allow emotional distress damages outside of – because she's entitled as an employee with a disability to pursue claims under federal statutes. So you're asking for over and above what she got from the Workers' Compensation Program. The bottom line is you want additional damages under the Rehab Act that would not be available under the Federal Employment Compensation Act. Correct. So that's where we are. Yes. And the Rehab Act goes further to allow for intentional acts of discrimination, emotional damages, and attorney fees and costs. What was the intentional act of discrimination in this case? One intentional act would be telling Ms. O'Connell that once she changed her status, she could no longer work five hours a day. The burden is on the employer to show an undue burden. But it has to be based on a protected status. What was the protected status that was discriminatory? Her injuries that didn't allow her to work in her prior position delivering mail. She was injured where she couldn't do that. And her sworn statement shows how it affected her major life activities that she couldn't run, climb stairs like she did before. And it went into the different limitations on tab 3, page 18 on the bottom right-hand corner. What case do you think most strongly supports your argument that this claim is not preempted by FECA? It was the Nichols case that was cited in the opening brief, also in the trial court with the district judge. And then the McLean case that was also cited. Those are Ninth Circuit cases, and even the government cites that in their answering brief. And because this was a federal statutory claim, the workers' compensation is not meant to afford remedies for intentional discrimination. That's left to Congress to enact statutes, the ADA, Title VII, the Rehab Act, the Age Discrimination Act. In Nichols it says, FECA does not prevent an award of additional payments for harms that fall outside of FECA's definition of injury. So in your view, what's FECA's definition of injury? It's a work-related injury that's limited solely to that. What injury did your client suffer that was outside the work-related injury? The failure to accommodate her disabilities. Who was the time of the discrimination that you contend? There was the ‑‑ it began in June 2000 when she asked for accommodations. And it also ties into this ‑‑ This is before the change that awarded back pay and all that? Yes. Going back to that time as discrimination. And also further to the September 2000 when the employer told her that she could reduce her to one hour a day or not schedule her at all. And whether you call that retaliation or you call that discrimination, that was after the August 14, 2000 letter from ‑‑ What is she doing now? She's still collecting ‑‑ She's working? No. She's collecting the workers' compensation payments still. Even as of this past week when I met with her. So she's no longer working at all? No. Okay. Mr. Lewis, would you like to save your ‑‑ some time for a rebuttal? Yes, Your Honors. That'd be ‑‑ Good morning. May I please the court? Assistant United States Attorney Edric Ching for Defendant John Potter. Your Honor, I just want to point out one fact with regard to Ms. O'Connell's counsel's representation that the supervisor, Colleen Suki, or Colleen Larson, stated that she could no longer work five hours per day. Your Honor, that is untrue. I'm referring to supplemental excerpt for the record, page 11, paragraph 5 stated that Ms. Suki stated that she told Ms. O'Connell that she was no longer entitled to limited duty status. She did not state that she would no longer be able to work five hours or that she would only be able to work one hour. And why was she no longer entitled to limited duty status? Your Honor, based on the evidence, it indicates that because she was no longer receiving the limited duty status. And at the time that Ms. Suki informed her of this event, that was right about the time that she was informed in late July 2000 that Ms. O'Connell was no longer entitled to the FECA benefits. So I think what Mr. Louise is trying to say is that even though a ruling comes out against Ms. O'Connell is that somehow the government should leave her on limited duty status until the entire, her entire reconsideration or appeal rights are done. And you know, I strongly disagree with that. At that point, I think Ms. Suki did the right thing by informing Ms. O'Connell, you know, you are no longer entitled to FECA benefits and therefore you're no longer entitled to limited duty status. And at that point when she went on to light duty status, she was no longer similarly situated to the three male employees referred to in the complaint. Because these three male employees who are on limited duty status were able to case or sort through the mail, which would require that the person be able to lift approximately 20 pounds. In our supplemental excerpts of the record, page 15, there is a work status note from be able to do any heavy lifting over 10 pounds. So at that point, Your Honor, they are not similarly situated because the male employees could lift 20 pounds and do one of the essential, maybe one of the essential, if not all of the duties of a male care, which is to lift 20 pounds and case and sort through the mail. Your Honor, I would just like to, with regard to the FECA preemption, the government heavily relies upon Mr. V. Runyon. And I just want to point out that Mr. V. Runyon does not state that all discrimination is preempted by FECA. I believe Mr. V. Runyon says that in that case, I believe the plaintiff brought three claims, disparate treatment, retaliation, and a reasonable accommodation claim. And in that case, the district court, which was affirmed by the Eighth Circuit, dismissed the reasonable accommodation claim, but allowed the retaliation and the disparate treatment claim to go to trial. Here, as I understand the Title VII and the Rehabilitation Act claims, they are based on injury that is not job-related, in that they are premised on treatment of her that occurred after the workers' comp commission determined that her job-related injuries had been resolved. Yes. To that extent, I question, they couldn't be preempted, could they? Are you referring to the reasonable accommodation claim in this case? Well, no, I'm referring to her Title VII claim. I guess it's a disparate treatment claim, basically. Oh, yes, Your Honor. Based on Mr. V. Runyon, the way I read Mr. V. Runyon is only the reasonable accommodation claim was preempted by FECA. So are you conceding that her discrimination claim was not preempted? Your Honor, at this point, based on my reading of Nichols and based on my reading of Mr. V. Runyon, I believe so, at this point. You believe so what? That Mr. V. Runyon only covers the reasonable accommodation claim. It did not cover the Title VII claims. So you are conceding that the Title VII claim is not preempted? Yes, Your Honor. Yes. Your Honor, going to the Title VII claim, I think I covered it a little earlier, was that one of the elements of the plaintiff's burden to establish a prima facie case is that he showed that similarly situated male employees were treated more favorably than her in this case because she was on light duty and the males were on limited duty. There is no evidence of similarly situated male employees and therefore the plaintiff, Ms. O'Connell, failed to establish the prima facie case. Even if the prima facie case was established, we then move to the next tier of analysis, which is whether there is a legitimate non-discriminatory reason for the fact that the males were getting eight hours and Ms. O'Connell was only getting one hour. And that reason is that pursuant to the postal rules, I believe, which is based on the contract with the unions, is that limited duty employees are paid for eight hours of work even though they don't do anything. So therefore, I believe most of the work is funneled to the people on limited duty versus light duty. And that was the reason that Ms. O'Connell was only getting one hour, as she claims. And I don't believe that Ms. O'Connell is going to be able to show, nor has she shown that this reason was based on pretext. Your Honor, I'm sorry to be jumping around. With regard to the preemption, Mr. Louise also refers to the McLean case. The government asserts that the McLean case discussed the collateral source rule and whether the award should be reduced and not whether FICA preempted any causes of action. Counsel, could you briefly address the retaliation claim? Okay. Yes, Your Honor. In this case do you consider that is preempted or not preempted? Your Honor, based on my, like I said before, based on my reading of Mr. V. Runyon, is that the FICA, in Mr. V. Runyon, FICA only preempted the reasonable accommodation claim and didn't preempt the retaliation and the disparate treatment. So in that case I don't know. You mentioned Title VII, and I didn't hear you say retaliation. So we're talking about those that's not preempted. Yes. Yes, Your Honor. With regard to the retaliation claim, if you look at supplemental excerpt for the record, pages 22 to 24, that indicates at the administrative phase Ms. O'Connell did not check off the box claiming retaliation because she did not do so, therefore she's barred because she did not exhaust her administrative remedies. But even if you take another step forward, I mean take another step after that and look at the substantive matters, the event of the alleged retaliation, which was Ms. Larson telling her about the reduced hours occurred in or about September 2000 and that her EEO complaint was filed in December 2000. So therefore, for a retaliation claim to take place, a protective EEO activity must occur prior to the alleged retaliation. In this case, the events were mixed up, and therefore there's no basis for the claim. Your Honor, with regard to Ms. O'Connell's disability discrimination claim, like I said before, at the time of the subject events, based on her limitations, she was not able to perform the essential functions of a mail carrier, which would include standing for prolonged periods of time, reaching, bending, twisting, and not only casing the mail, which would require lifting 20 pounds, but would require lifting sacks and trays up to 70 pounds. She was not able to do that, nor did she carry her burden by identifying any type of reasonable accommodations, which would allow her to do her job or to identify any other jobs which she could do with an accommodation. Finally, Your Honor, with regard to the courts granting the USA's leave to file motions, I'm not trying to make excuses for anybody, but I'm the third attorney on this case, and at the time of that status conference, the attorney who indicated she would like to file motions was the second attorney on the case. And Judge Gilmour only gave her, I believe, less than two months to file a motion for summary judgment, which she did. And I think that Judge Gilmour did this to save judicial resources and also the resources of the parties. If we did not file these motions, if we proceeded to trial, a lot of these claims would have been thrown out on directed verdict or resolved via motions in limine. I believe that the USA is also entitled to bring a motion for lack of subject matter jurisdiction at any time before trial or during trial. All right. You also made a mootness claim. Yes. Mootness. Yes, Your Honor. With regard to the plaintiff's reasonable accommodation, with regard to Ms. O'Connell's reasonable accommodation claim, it was preempted pursuant to Mr. V. Runyon, preempted by FECA, and therefore since only the OWCP and the administrative portion of it, there's no judicial review of their decision, then this case is moot and there's nothing left to decide. Wait a minute. I don't understand. Why is it moot? Because when the administrative decision is made with regard to a claimant's workers' compensation benefits, there's no judicial review of that issue. What about the damages from the other retaliation and compensation? Yes, Your Honor. I was only referring to the reasonable accommodation claim, you know, which is covered by Mr. V. Runyon. Okay. All right. Thank you. Thank you. Mr. Chang, would you like to start? Thank you, Your Honors. One thing I did want to point out is even the procedural posture of the case when the summary judgment was brought, all the facts are supposed to be drawn in a light most favorable to the nonmoving party, and the court's not supposed to weigh the evidence. And if Ms. O'Connell claims in her declaration that Ms. Suki told her to change her status, then all reasonable inferences along those lines were to be drawn in favor of her as a nonmoving party, even if the government disputes that, because then that would be weighing of conflicting evidence, and the court's not supposed to weigh the evidence of the parties or determine the credibility in a motion for summary judgment status. And if you look at tab three, page 21 at the bottom, Ms. Suki's initials are right there that she received this on 6-12-00, that request for accommodation. And then also that ---- You realize that's very difficult for us to hear you? Oh, I'm sorry, Your Honor. I was saying that also tab three, bottom page 25, it says that she gave that letter, Pat, dated 8-14-00. That's her initials again. When you look at the government's supplemental excerpts on there, page 16, it goes through all the different things that Ms. O'Connell could still do with her disability that she was alleging. And it was really a jury question whether or not the three males who were allowed to still work at that same office because she'd been working all that time. That was really a jury question based on a gender that should have been presented to the jury and not for the court to decide on a dispositive motion. If there's nothing further, I'll ---- Thank you, Mr. Ruiz. Thank you, Count and Mr. Chang, both of you. The matter just argued will be submitted. And we'll just take a brief recess while the telephone connection is established for the final argument on the calendar. All rise. This court stands to recess for five minutes. Thank you.  Hi, Randy. How are you? Great. Okay. They're just taking a five-minute recess. Okay. Okay. Yes, you do. Okay. Actually, Randy, I need to call ---- Yeah. I need to make this call again. I'm going to call back. All right. Can you let them know it's just not quite ready? Hang on. It'll be a couple minutes. Okay. Yeah. Yeah, yeah. I figured it out. Okay.  Thank you. Hi, there. I'm sorry, Randy. I had to change a setting. Okay, great. I'll leave this up. Is there? Yes, there is. It's going to be on the screen. In the center will be Judge Raymer. As you see it on the screen, the left-hand side judge will be Judge Rawlinson. Is that Tyler? Yeah, yeah. Judge Rawlinson? Yeah. And Judge Hug is the remaining judge. Correct. Okay. Sure. Let me just. Do you hear me from up here? Yes, I do. Can you hear me okay? Yeah, we can hear you.    Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Can you see us? Or can you only see the judges? No, he can see you as well. Hey, Clayton. He can see if you stand here. Clayton. He can see. See you, Clayton. Yeah. How's it going? Yeah, I had an earlier one with Sean Lewis. I had an earlier argument, so. Yeah. Yeah, I'm pretty tired. I'm coming home this afternoon, so. Yeah. Yeah. Yeah.  Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. How do I get it?
judges: Hug, Rymer, Rawlinson